IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DELIA MCCOY-MCMAHON,           )
                               )  Civil Action
              Plaintiff        )  No. 08-cv-05989
                               )
        vs.                    )
                               )
J. CARLTON GODLOVE, II,        )
BRIAN R. KELLY,                )
PATRICK M. MCCOY,              )
LEWIS J. MCCOY, JR. and        )
SPOTTS, STEVENS & MCCOY,       )
                               )
              Defendants       )


APPEARANCES:
          JAY W. WALDMAN, ESQUIRE
          SUSAN K. QUIRITS, ESQUIRE
          ANDREA E. MERTZ, ESQUIRE
               On behalf of plaintiff

          STACEY A. SCRIVANI, ESQUIRE
               On behalf of defendants


**O P I N I O N**

     This matter is before the court on Defendants' Motion

to Dismiss Plaintiff's Complaint Pursuant to F.R.Civ.P. 12(b)(6),

which motion was filed on January 5, 2009.[1]

     For the following reasons, I grant defendants motion to

dismiss with respect to Count XIV of plaintiff's Complaint, which

alleged that defendants violated the Racketeer Influenced and

_____

     [1]     Defendants' Memorandum of Law in Support of Their Motion to
Dismiss Complaint was filed January 5, 2009.  Plaintiff's Opposition to
Defendants' Motion to Dismiss Complaint Pursuant to F.R.Civ.P. 12(b)(6)
and Memorandum of Law in Support Thereof was filed January 29, 2009.  Defendants'
Reply Brief in Further Support of its Motion to Dismiss was filed March 17,
2009.

          Defendants' motion to dismiss, brief and reply brief, and
plaintiff's opposition brief were each dismissed without prejudice to
reinstate by my Order dated and filed September 29, 2009.  Each document was
reinstated on November 10, 2010

Corrupt Organizations Act ("RICO").[2]  Specifically, I conclude that plaintiff has failed to allege a pattern of racketeering activity and has not alleged an injury to her business or property, as required by RICO.  Moreover, I conclude that an amendment to plaintiff's Complaint would be futile because plaintiff's proposed amendments would not establish that defendants proximately caused an injury to plaintiff's business or property.

Furthermore, I dismiss the remainder of plaintiff's Complaint, which alleges thirteen pendant state-law claims, for lack of subject matter jurisdiction.  Plaintiff has not established diversity jurisdiction, and I conclude that plaintiff's state-law claims predominate over plaintiff's sole federal claim, which I have dismissed.

Accordingly, I dismiss the remaining portion of defendants' motion to dismiss plaintiff's state-law claims as moot without prejudice to raise the issues as preliminary objections in state court.

<u>COMPLAINT</u>

This case arises from the corporate governance and merger of defendant Spotts, Stevens and McCoy, Inc. ("SSM"), a Pennsylvania business corporation, which merged into a special purpose holding-company, Wyomissing Holdings, Inc., ("WHI"). Defendants J. Carlton Godlove, Brian Kelly, Patrick McCoy and Lewis McCoy (collectively "individual defendants") were directors

---

[2]     18 U.S.C. §§ 1961 through 1968.

of SSM and collectively owned 89% of SSM common stock.

Plaintiff Delia McCoy-McMahon was a minority shareholder of SSM before she was "squeezed out" in this merger. Plaintiff contends that the "Freeze-Out Merger" had an improper purpose, used an unfair process, and squeezed plaintiff out at an unfair price.

Plaintiff also alleges the individual defendants, in their capacity as directors of SSM, breached their fiduciary duty owed to shareholders and the corporation[3] and, in their capacity as controlling shareholders, breached their fiduciary duty owed to minority shareholders.

In total, plaintiff asserts fourteen causes of action for breach of fiduciary duties, fraud, breach of contract, violations of Pennsylvania securities laws, unjust enrichment, and violations of RICO.[4]  The first thirteen claims are brought pursuant to Pennsylvania state law.  Count XIV for violation of RICO is a federal law claim.

In Count I, plaintiff claims that the individual defendants breached a fiduciary duty by setting and securing excessive compensation for their roles as directors of Spotts, Stevens and McCoy, Inc.  Count II alleges that the individual defendants engaged in corporate waste, and mismanaged corporate

---

[3]     Plaintiff seeks to bring this lawsuit individually as a shareholder and derivatively on behalf of SSM.  See Complaint at paragraphs 1, 2.  Plaintiff brings Count I, II, III, IV, VII, VIII, IX, XI, XII, and XIII individually and derivatively.  Count V, VI and XIV are brought individually.

[4]     18 U.S.C. §§ 1961 through 1968.

assets.  Count III avers that the individual defendants misappropriated a corporate opportunity.  Specifically, plaintiff alleges that the individual defendants capitalized on a profitable real estate venture for their own pecuniary benefit at the expense of SSM.

Count IV claims that the individual defendants, in their capacity as controlling shareholders, breached their fiduciary duties to the minority shareholders, including plaintiff, by withholding pertinent information about the corporation in order to exercise unfettered control of corporate decisions.

Count V, asserts that the individual defendants breached their fiduciary duty by implementing the Freeze-Out Merger, which plaintiff alleges had no business justification and was entered into in order to circumvent direct and derivative liability to plaintiff.  Further, plaintiff alleges that the merger was not authorized by a majority of uninterested directors and that the consideration paid to minority shareholders for their stock did not represent its fair value.

Count VI states a claim that the individual defendants violated the Pennsylvania Securities Act of 1972.[5]  Specifically, plaintiff contends that the materials provided by the individual defendants to minority shareholders regarding the merger contained untrue statements of material fact about the true value

---

[5]     Act of December 5, 1972, P.L. 1280, No. 284, § 401, 70 P.S. § 1-401.

of SSM stock.

Count VII asserts a claim for fraud.  Count VIII is a claim for intentional misrepresentation, and Count IX alleges negligent misrepresentation.

Count X alleges a cause of action for breach of fiduciary duty, based on the individual defendants failure to disclose material information about SSM and the potential or actual conflicts of interests of the individual defendants. Count XI alleges that the failure of the individual defendants to perform their duties as directors of SSM breached their employ-ment contract with SSM.

Count XII is a claim for unjust enrichment against the individual defendants for profits they realized in violation of their fiduciary duties.  Count XIII alleges that the individual defendants collectively conspired to engage in the unlawful acts described in Counts I through XII.

Finally, Count XIV asserts that the individual defendants violated RICO.  18 U.S.C. § 1962(c).  Specifically, plaintiff contends that defendants' conduct, described in Counts I through XIII, violated 18 U.S.C. §§ 1341, 1343, 1344 and 157, which establish liability based on mail fraud, wire fraud, bank fraud, and bankruptcy fraud, respectively.

<u>JURISDICTION</u>

Jurisdiction in this case is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This court has

supplemental jurisdiction over plaintiff's pendent state-law claims.  See 28 U.S.C. § 1367.

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiff's claims allegedly occurred within Berks County, Pennsylvania, which is located within this judicial district.

## STANDARD OF REVIEW

A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."[6]  Fed.R.Civ.P. 12(b)(6).  A Rule 12(b)(6)

---

[6]     Plaintiff contends that defendants challenge to plaintiff's standing to litigate 11 of her 14 claims should have been brought pursuant to Fed.R.Civ.P. 12(b)(1), which contests subject matter jurisdiction instead of Rule (12)(b)(6), which is based on the failure to state a claim.

Plaintiff confuses the doctrine of constitutional standing, which is jurisdictional, with the doctrines of derivative standing and standing under RICO, which are evaluated on the adequacy of the pleadings.  "A motion to dismiss under Rule 12(b)(6) for lack of RICO standing is distinct from a motion to dismiss under Rule 12(b)(1) for lack of constitutional standing." Walter v. Palisades Collection LLC., 480 F.Supp.2d 797, 804, n.10 (E.D.Pa. 2007) (Robreno, J.) (internal citations omitted).

(Footnote 6 continued):

motion requires the court to examine the sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957) (abrogated in other respects by Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Generally, in ruling on a motion to dismiss, the court relies on the complaint, attached exhibits, and matters of public record, including other judicial proceedings.  Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2008).

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  Rule 8(a)(2) "[does] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Twombly,

_____

(Continuation of footnote 6):

RICO standing requirements are viewed as questions regarding the adequacy of the pleadings, rather than as questions of subject matter jurisdiction.  Id.; see also Gradeless v. American Mutual Share Insurance Corporation, 2011 U.S.Dist. LEXIS 31877 at *12, n.2 (S.D.In. March 23, 2011) holding that direct and derivative standing is a distinct concept from Article III standing.

Therefore, because defendants' motion to dismiss challenges plaintiff's standing to bring a RICO claim and a derivative suit, I will analyze defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

550 U.S. at 570, 127 S.Ct. at 1974, 167 L.Ed.2d at 949.[7]

In determining whether a plaintiff's complaint is sufficient, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief." Fowler, 578 F.3d at 210 (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).

Although "conclusory or 'bare-bones' allegations will [not] survive a motion to dismiss," Fowler, 578 F.3d at 210, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Phillips, 515 F.3d at 231. Nonetheless, to survive a 12(b)(6) motion, the complaint must provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." Id. (quoting Twombly, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940) (internal quotation omitted).

---

[7]    The Supreme Court's Opinion in Ashcroft v. Iqbal, __U.S. __, __, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868, 887 (2009), states clearly that the "facial plausibility" pleading standard set forth in Twombly applies to all civil suits in the federal courts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). This showing of facial plausibility then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and that the plaintiff is entitled to relief. Fowler, 578 F.3d at 210 (quoting Iqbal, __ U.S. at __, 129 S.Ct. at 1949, 173 L.Ed.2d at 884). As the Supreme Court explained in Iqbal, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that the defendant acted unlawfully." Iqbal, __ U.S. at __, 129 S.Ct. at 1949, 173 L.Ed.2d at 884.

The court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion.  First, the factual matters averred in the complaint, and any attached exhibits, should be separated from legal conclusions asserted therein. Fowler, 578 F.3d at 210.  Any facts pled must be taken as true, and any legal conclusions asserted may be disregarded. Id. at 210-211.

Second, the court must determine whether those factual matters averred are sufficient to show that the plaintiff has a "plausible claim for relief."  Id. at 211 (quoting Iqbal, __ U.S. at __, 129 S.Ct. at 1950, 178 L.Ed.2d at 884).

Ultimately, this two-part analysis is "context-specific" and requires the court to draw on "its judicial experience and common sense" to determine if the facts pled in the complaint have "nudged [plaintiff's] claims" over the line from "[merely] conceivable [or possible] to plausible."  Iqbal, __ U.S. at __, 129 S.Ct. at 1950-1951, 178 L.Ed.2d at 884-885 (internal quotations omitted).

A well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  Twombly, 550 U.S. at 556, 127 S.Ct. at 1965, 167 L.Ed.2d at 940-941.

FACTS

Based upon the allegations in plaintiff's Complaint, which under the foregoing standard of review I must accept as true for purposes of defendants' motion to dismiss, the pertinent facts are as follows.

In 1993, after a series of corporate reorganizations and mergers not relevant to this action, Spotts, Stevens and McCoy ("SSM") was formed.[8]  Plaintiff acquired 13,693 shares of SSM stock.[9]

On September 12, 1996, the entire Board of Directors for SSM resigned, and the then-president's employment was terminated, and the individual defendants, J. Carlton Godlove, II, Brian R. Kelly, Patrick M. McCory and Lewis J. McCoy, Jr. were elected to replace the Board.[10]

Also on September 12, 1996, plaintiff entered into a shareholder agreement with the individual defendants, which granted the individual defendants the right to vote all of their respective shares.[11]  The shares subject to the shareholder agreement composed 95.81% of the total outstanding shares of SSM common stock.[12]  By March 27, 1998, the four individual defendants, J. Carlton Godlove, II, Brian R. Kelly, Patrick M.

---

[8]     Complaint, ¶¶ 13 and 14.

[9]     Complaint, ¶ 16.

[10]    Complaint, ¶¶ 47 and 48.

[11]    Complaint, ¶¶ 31 and 32.

[12]    Complaint, ¶ 33.

McCoy and Lewis J. McCoy, Jr., each owned, directly or indirectly, 22.27% of the outstanding shares of common stock, or an aggregate of 89.06% of the outstanding stock.[13]

Upon being elected directors of SSM, each defendant entered into an employment agreement with SSM.[14]  The employment agreements established base salaries and benefits for the individual defendants, which were subject to increase, but not decrease, and further provided that the directors were eligible to receive an annual bonus if the directors established an incentive plan to govern bonus disbursements.[15]  No incentive plan was ever established.[16]

Between 1996 and 2008 the individual defendants were paid salaries and bonus packages deemed excessive by plaintiff.[17]  Moreover, in establishing their compensation, the individual defendants ignored formalities of SSM's bylaws and, in the absence of a formal resolution by the board, established a compensation committee to allocate a "bonus pool."[18]  The bonus pool was repeatedly allocated exclusively to the individual defendants.[19]

---

[13]     Complaint, ¶ 34.

[14]     Complaint, ¶¶ 49 and 50.

[15]     Complaint, ¶¶ 49-50, 53, 56 and 60.

[16]     Complaint, ¶ 61.

[17]     Complaint, ¶¶ 63, 68, 74, 80, 88, 101, 114, 120, 133, 146 and 151.

[18]     Complaint, ¶¶ 90-96, 108-112 126-131, 127-131 and 140-144.

[19]     Complaint, ¶¶ 99, 113, 132 and 145.

Moreover, contrary to provisions in SSM's bylaws, plaintiff repeatedly did not receive notification of annual shareholder meetings and the individual defendants did not furnish SSM's financial statements and balance sheets to shareholders.[20]

On June 9, 2000, the individual defendants mailed a letter to SSM shareholders setting forth a tender offer, which expired after 5 days. The tender was an offer to purchase all of the outstanding shares of SSM.[21] This "Buyback Letter" offered $5.16 per share based on a calculation of share value as set forth in the shareholder agreement.[22]

According to the Buyback Letter, SSM did not have any plans that would materially affect the value of SSM stock. Additionally, the Buyback Letter indicated that SSM planned to continue to reinvest into the business for corporate purposes such as updating technology, hiring and compensating talented employees, expanding SSM's office, and paying down debt.[23]

However, contrary to the plans identified by the Buyback Letter, corporate profits were used to fund bonus pools for the individual defendants.[24] Additionally, the individual

---

[20]    Complaint, ¶¶ 67, 70, 73, 76, 79, 82, 87, 90, 103, 106, 116, 119, 122, 125, 135, 148, 153 and 156.

[21]    Complaint, ¶ 166.

[22]    Complaint, ¶ 167.

[23]    Complaint, ¶¶ 171-173.

[24]    Complaint, ¶¶ 171-173.

defendants possessed insider information about the value of SSM, and the offer of $5.16 per share was undervalued.[25]

On June 10, 2000, plaintiff called defendant Kelly with questions about the Buyback Letter.[26]  Mr. Kelly told plaintiff that the individual defendants had plans to sell the corporation and that he would not let the corporation be sold for anything less than $40-$50 per share.  He also said the individual defendants were were hopeful of obtaining an offer for $90-$100 per share because they "were thinking big."[27]

Twenty-four shareholders, totaling more than 20,000 shares of SSM stock, sold their shares pursuant to the terms of the Buyback Letter.[28]  The price of SSM stock six weeks after the Buyback Letter was sent rose to $5.90 per share, costing the shareholders who sold their stock more than $14,600.[29] Plaintiff, however, did not sell her shares.

On June 6, 2003, the individual defendants formed a partnership called Uniquad Management Group, L.P. ("Uniquad"). The only limited partners of Uniquad were the individual defendants.[30]

On June 24, 2003, Uniquad purchased property at 1047

---

[25]   Complaint, ¶¶ 171-173.

[26]   Complaint, ¶ 175.

[27]   Complaint, ¶¶ 176 and 178.

[28]   Complaint, ¶ 181.

[29]   Complaint, ¶ 179.

[30]   Complaint, ¶ 268.

North Park Road, in Wyomissing, Berks County, Pennsylvania to serve as SSM's new headquarters for more than $2.5 million.  The North Park Road property was 100% financed.[31]

SSM, as directed by the individual defendants, agreed to guarantee the $2.5 million debt without obtaining any consideration or collateral from Uniquad.[32]  SSM's guarantee of the Uniquad debt was not noted in minutes recorded at SSM board meetings and the individual defendants did not obtain approval from the shareholders to guarantee the debt.[33]

Currently, SSM pays a monthly rent of $35,833 per month to Uniquad for the property.[34]

Despite Uniquad making the purchase, and SSM merely guaranteeing the debt and providing rental payments, on June 24, 2003, the individual defendants published a press release, revealing that SSM purchased the North Park Road property.[35] Based on the "Press Release," plaintiff assumed that the property was an SSM asset.[36]

Following the purchase of the new headquarters, SSM financed the furnishing of an $80,000 "Taj Mahalic" office for

---

[31]     Complaint, ¶¶ 270 and 271.

[32]     Complaint, ¶¶ 272 and 273.

[33]     Complaint, ¶ 274.

[34]     Complaint, ¶ 280.

[35]     Complaint, ¶ 275.

[36]     Complaint, ¶¶ 277, Exhibit T.

defendant Godlove.[37]  In total, SSM spent $600,000 furnishing the new headquarters, none of which was approved by a formal vote by the individual defenants as directors of SSM, the shareholders, or noted in the minutes at SSM board meetings.[38]

On July 5, 2006, plaintiff sent the individual defendants and SSM a verified request for inspection and examination of its corporate books pursuant to § 1508[39] of the Pennsylvania Business Corporations Law ("BCL").[40]  SSM conditioned plaintiff's inspection of corporate records on plaintiff signing a confidentiality agreement presented by the individual defendants.  The confidentiality agreement would have required plaintiff to waive certain statutory rights granted by the BCL.[41]

A dispute over the terms of the confidentiality agreement ensued, and on August 8, 2006, plaintiff filed a Petition to Compel Inspection of Corporate Records in the Court of Common Pleas of Berks County, Pennsylvania in case number 06-9043.[42]

Based on an agreement between plaintiff, the individual defendants, and SSM, on September 19, 2006, plaintiff withdrew,

---

[37]    Complaint, ¶¶ 278 and 279.

[38]    Complaint, ¶ 280.

[39]    15 Pa.C.S.A. § 1508.

[40]    Complaint, ¶ 186.

[41]    Complaint, ¶ 188.

[42]    Complaint, ¶¶ 188-193.

without prejudice to refile, her petition to compel inspection.[43]
Despite having reached an agreement requiring the defendants to
turn over corporate books and records by October 17, 2006,
defendants failed to comply until sixteen days beyond the
deadline.[44]  Even the documents which were turned over late by
defendants were incomplete, and plaintiff sent defendants a
second verified request for inspection of corporate documents.[45]

Defendants attempted to bring an action for declaratory
judgment pertaining to plaintiff's request for records in the
Court of Common Pleas of Berks County, Pennsylvania in case
number 06-9043.[46]  Defendants' filings were returned because the
docket number 06-9043 had become inactive.[47]

Defendants then filed a new motion in Berks County
Court for declaratory judgment in case number 07-2865.[48]
Plaintiff re-filed her petition to compel inspection in case
number 06-9043 and a motion to consolidate all the pending Berks
County actions involving the parties.[49]

On December 26, 2007, plaintiff's request to inspect
SSM's corporate books was granted by Order issued in state

---

[43]     Complaint, ¶¶ 194 and 195.

[44]     Complaint, ¶¶ 197-199.

[45]     Complaint, ¶¶ 200 and 201.

[46]     Complaint, ¶ 208.

[47]     Complaint, ¶ 209.

[48]     Complaint, ¶ 210

[49]     Complaint, ¶ 211.

court.[50]  Defendants failed to immediately comply with the court
Order, despite multiple requests from plaintiff.  When SSM
documents were eventually turned over in January 2008, they were
deficient.[51]

In response to defendants' deficient disclosure,
plaintiff filed a motion to reveal confidential information in
Berks County Court on March 6, 2008.[52]  On May 19, 2008,
following a court hearing on plaintiff's motion to reveal
confidential information, plaintiffs and defendants agreed that
plaintiff would file a complaint under seal, but that plaintiff
would be able to communicate with shareholders by letter
concerning averments made in the complaint.[53]  Accordingly,
defendants were to provide plaintiff with SSM's shareholder list
and stock ledger.[54]

Despite this agreement, defendants stalled in drafting
a letter to shareholders pertaining to plaintiff's complaint, and
the shareholder ledger provided to plaintiff was incomplete based
on a comparison with a list provided to plaintiff at the 2007
annual stockholder meeting.[55]

In addition to failing to provide plaintiff with the

---

[50]    Complaint, ¶ 217.

[51]    Complaint, ¶¶ 221, 224 and 225.

[52]    Complaint, ¶ 229.

[53]    Complaint, ¶ 237.

[54]    Complaint, ¶ 237.

[55]    Complaint, ¶¶ 244 and 246-252.

requested corporate information, the individual defendants also failed to disclose to shareholders the existence of pending litigation against SSM.[56]  Specifically, not including the present action, SSM is a defendant in four lawsuits (three federal actions in the United States District Court for the Eastern District of Pennsylvania and one state action in the Court of Common Pleas of Berks County, Pennsylvania, which were initiated between 2005 and 2008.[57]

On October 24, 2008 SSM merged with WHI, a special purpose corporation, whose board was composed entirely of the individual defendants.[58]  WHI was formed for the sole purpose of holding the individual defendants' shares of SSM stock and freezing plaintiff out of her shares.  Because of the "Freeze-Out Merger," the individual defendants and their spouses obtained control of 100% of the remaining shares of SSM stock.[59]

The Freeze-Out Merger was not submitted to shareholders for approval despite provisions within SSM's bylaws which provide that contracts or transactions between SSM and another corporation in which directors have a conflict of interest require disclosure and approval by a majority of disinterested directors or shareholders.[60]

---

[56]     Complaint, ¶ 289.

[57]     Complaint, ¶¶ 291-307.

[58]     Complaint, ¶¶ 313 and 317.

[59]     Complaint, ¶¶ 316 and 335.

[60]     Complaint, ¶¶ 312 and 322.

Plaintiff received a letter from defendant Godlove on October 27, 2008 informing her that the corporation had been involved in a merger with WHI.[61]  In a packet of merger-related materials, plaintiff also received a copy of the merger agreement, and a fair value analysis and valuation of SSM stock, which was designated at $11.03 per share.[62]

The "Freeze-Out Merger Materials" contained numerous untrue statements pertaining to the valuation of SSM stock. Specifically, the financial statements did not account that the individual defendants' compensation was determined to be excessive by a human resources consulting firm retained by SSM.[63]

Additionally, the calculation of merger consideration did not account for the likelihood of SSM recovering damages from plaintiff's forthcoming lawsuit, which plaintiff planned to bring derivatively on behalf of SSM against the individual defendants.[64]

On September 9, 2008, plaintiff formally demanded in writing that the SSM board initiate a lawsuit against the board of directors.[65]  On October 8, 2008, the defendants rejected plaintiff's demand.[66]  On November 25, 2008, plaintiff filed the

---

[61]     Complaint, ¶ 311.

[62]     Complaint, ¶¶ 311 and 334.

[63]     Complaint, ¶ 459.

[64]     Complaint, ¶ 459.

[65]     Complaint, ¶ 342.

[66]     Complaint, ¶ 345.

instant lawsuit in the Court of Common Pleas of Berks County, Pennsylvania.  On December 26, 2008, defendants filed a Notice of Removal on the grounds that the Complaint raised a substantial issue of federal law under 18 U.S.C. § 1331.

<u>DISCUSSION</u>

Of the fourteen claims brought by plaintiff, only Count XIV presents a federal question.  Count XIV asserts liability under RICO.  The first thirteen counts of plaintiff's Complaint are all state law causes of action for breach of fiduciary duties, breach of contract, or violations of Pennsylvania securities laws.

For the reasons set forth below, I conclude that plaintiff fails to state a claim upon which relief can be granted under RICO and therefore I grant defendants' motion to dismiss Count XIV.  Consequently, the Complaint fails to state a federal cause of action.  Without a federal question before the court, I elect to dismiss plaintiff's remaining claims, without prejudice, for lack of subject matter jurisdiction.

<u>Racketeer Influenced and Corrupt Organizations Act ("RICO")</u>

Plaintiff's federal claim alleges that the individual defendants violated 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Title 18 of United States Code Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

-20-

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."  18 U.S.C. § 1962(c).  "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court...."  18 U.S.C. § 1964.

To establish a RICO claim, a plaintiff must show "(1) the existence of a RICO enterprise; (2) the existence of a pattern of racketeering activity; (3) a nexus between the defendant, the pattern of racketeering activity or the RICO enterprise; and (4) resulting injury to the plaintiff's business or property."  <u>Smith v. Jones, Gregg, Creehan & Gerace, LLC.</u>, 2008 U.S.Dist LEXIS 98530 at *4 (W.D.Pa. Dec. 5, 2008).

<u>Enterprise</u>

A RICO enterprise is broadly defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

SSM qualifies as an enterprise within the meaning of RICO.  SSM provides engineering services to customers and clients in other states.  Morever, the individual defendants, as directors of SSM, are employed and associated with the enterprise.

Racketeering Activity

Title 18 of United States Code Section 1961(1) proscribes the criminal offenses that qualify as predicate acts of "racketeering activity" for the purpose of establishing RICO liability.  Plaintiff alleges that the individual defendants, engaged in schemes to defraud plaintiff and SSM, as described in Counts I through XIII of the Complaint.  Plaintiff alleges that, in doing so, they committed mail fraud, wire fraud, bank fraud, and bankruptcy fraud in violation of 18 U.S.C. §§ 1341[67], 1343[68],

---

[67]   Title 18 U.S.C. Section 1341 provides in pertinent part:

§ 1341 Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both....

[68]   Title 18 U.S.C. Section 1343 provides in pertinent part:

§ 1343 Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both....

1344[69] and 157[70], respectively.[71]

Mail fraud, wire fraud, bank fraud and bankruptcy fraud all constitute predicate acts of racketeering activity under 18 U.S.C. § 1961(1).

Allegations sounding in fraud as the basis for establishing predicate acts of racketeering activity under RICO, must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Warden v. McClelland, 288 F.3d 105, 114 (3d Cir. 2002). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be

---

[69]    Title 18 U.S.C. Section 1344.

§ 1344 Bank Fraud

Whoever knowingly executes, or attempts to execute, a scheme or artifice--(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

[70]    Title 18 U.S.C. Section 157.

§ 157 Bankruptcy fraud

A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so-(1) files a petition under title 11, including a fraudulent involuntary petition under section 303 of such; (2) files a document in a proceeding under title 11; or (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title, shall be fined under this title, imprisoned not more than 5 years, or both.

[71]    Complaint, ¶ 600.

averred generally." Fed.R.Civ.P. 9(b).

In the context of allegations of fraud under RICO, Rule 9(b) requires the Complaint to "identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation." <u>Bonavitacola Electric Contractor, Inc. v. Boro Developers, Inc.</u>, 87 Fed.Appx. 227, 231 (3d Cir. 2003) (<u>citing</u> <u>Annulli v. Panikkar</u>, 200 F.3d 189, n.10 (3d Cir. 1999)).

Accordingly, giving due consideration to the heightened pleading requirements of Rule 9(b), in order to determine whether plaintiff has a cause of action under RICO, it is necessary to determine whether plaintiff has stated a claim for mail fraud, wire fraud, bank fraud, or bankruptcy fraud.

A.  <u>Mail and Wire Fraud</u>

In order sustain a charge of mail fraud, the plaintiff must establish "(1) The existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the Postal Service to execute the scheme." <u>Brownwell v. State Farm Mutual Insurance Company</u>, 757 F.Supp. 526, 538 (E.D.Pa. 1991) (Waldman, J.) (<u>citing</u> <u>United States v. Burks</u>, 867 F.2d 795, 797 (3d Cir. 1989)).  The elements of wire fraud are the same, except wire fraud applies to electronic communications. <u>Kronfield v. First Jersey Nationl Bank</u>, 638 F.Supp. 1454, 1470 (D.N.J. 1986).

Plaintiff alleges the individual defendants used United States mail and telephone calls in furtherance of schemes to defraud SSM, and the plaintiff and other minority through the mailing or wire transmission of the following communications: (1) the Buyback Letter; (2) the Press Release; (3) the various telephone calls between plaintiff and one or more of the individual defendants; and (4) the Freeze-Out Merger materials.[72]

(1)   Buyback Letter

On June 9, 2000, the individual defendants mailed a letter to the shareholders setting forth a tender offer to purchase all (but not less than all) of SSM's shares owned by such shareholders.[73]   The Buyback Letter indicated that SSM would forgo paying dividends in the near future in order to "reinvest into the business for corporate purposes such a increasing and updating the Corporation's technology, hiring, and compensating talented employees, funding a large addition to the Corporation's building...and paying down debt."[74]

The Buyback Letter also stated that SSM "had no plans that would have any material effect on the value of the stock."[75] Despite defendants' representations, the SSM's stock price rose by 12.37% in the fiscal quarter following the tender offer proposed in the Buyback Letter.

---

[72]   Complaint ¶ 600.

[73]   Complaint ¶ 166, Exhibit E.

[74]   Complaint ¶ 171.

[75]   Complaint ¶ 174.

Plaintiff alleges that the individual defendants had no intention to reinvest in SSM, but instead intended to use the SSM profits to fund bonus pools for the individual defendants. Moreover, plaintiff alleges that the individual defendants possessed material, non-public information, about SSM and had (or should have had) knowledge that SSM's stock value would rise shortly after the tender offer.[76]

Plaintiff's allegations concerning the Buyback Letter are sufficiently particularized and describe the existence of a scheme to defraud SSM's stockholders by inducing them to sell their stock at a deflated value.  Furthermore, by mailing the Buyback Letter to the stockholders, the individual defendants utilized the United States mail to execute the scheme. Therefore, the allegations concerning the Buyback Letter are sufficient to establish a predicate act of mail fraud for purposes of RICO.

(2) Press Release

On June 24, 2003, after the individual defendants caused SSM to guarantee the $2.5 million in debt incurred by Uniquad to purchase the North Park Road Property, the individual defendants published the Press Release, which stated that SSM, rather than Uniquad had purchased the property.[77]  Accordingly, plaintiff believed the North Park Road property was an asset of SSM, rather than of Uniquad.

---

[76]    Complaint ¶¶ 172 and 180.

[77]    Complaint ¶¶ 271-275; Exhibit T.

The Press Release was published electronically and therefore qualifies as an electronic communication under 18 U.S.C § 1344.  See  In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1249 (3d Cir. 1989).  Moreover, plaintiff has alleged that the Press Release was executed in furtherance of the individual defendants' scheme to defraud SSM by usurping a profitable real estate opportunity.  Therefore, the allegations concerning the Press Release are sufficient to establish a predicate act of wire fraud.

(3) Various Telephone Calls

Plaintiff alleges that "various telephone calls" were made between plaintiff and one or more of the individual defendants during which the individual defendants pursued a scheme to defraud.

An allegation of "various telephone calls," without more, is not sufficient to meet the heightened pleading requirements of Fed.R.Civ.P 9(b).  See Bonavitacola Electric Contractor, Inc., 87 Fed.Appx. at 231.  This case states that RICO allegations sounding in fraud must allege the "who, what, when and where details of the alleged fraud."  Plaintiff, however, does describe one phone call between plaintiff and an individual defendant, which is incorporated into Count XIV of the Complaint.

As indicated in the Findings of Fact, above, on June 10, 2000, plaintiff called defendant Kelly with questions about the Buyback Letter.  On the telephone, Kelly told plaintiff that

the directors were planning on selling SSM and would not accept anything less than $40-$50 a share.[78]  Kelly told plaintiff that the individual defendants conceived of obtaining $90-$100 per share because "we're thinking big."[79]  Based on Kelly's statement, plaintiff assumed she was part of the "we" referred to by Kelly.

Plaintiff does not allege that defendant Kelly made any misrepresentations to plaintiff at the time of the phone call. Nor does plaintiff allege how the phone call was in furtherance of a scheme to defraud plaintiff or SSM.  Plaintiff alleges that the buyback offer proposed by the individual defendants in the Buyback Letter was deficient based on the subsequent rise in the price of SSM stock and that the 24 shareholders who accepted the tender offer lost a total $14,600 after the stock rose in value from $5.17 per share to $5.90 per share.

Defendant Kelly's statement, however, cannot be interpreted as part of a scheme to influence plaintiff to sell her SSM stock at an undervalued price.  On the contrary, Kelly's statement would encourage plaintiff to keep her shares with the expectation that she would eventually receive at least $40-50 per share when SSM was sold.  Therefore, plaintiff has not alleged that the phone call was part of a scheme to defraud.

Because plaintiff does not allege with particularity any other phone calls in furtherance of defendants' scheme to

---

[78]     Complaint ¶¶ 175-178.

[79]     Complaint ¶¶ 175-178.

defraud, plaintiff's allegations of "various phone calls" are insufficient to establish a predicate act of a RICO violation.

        (4)  <u>Freeze-Out Merger Materials</u>

        On October 27, 2008, plaintiff received a letter from defendant Godlove informing her that SSM had merged with WHI.[80] Plaintiff alleges that the Freeze-Out Merger was consummated in violation of the SSM's bylaws and lacked any legitimate business purpose.[81]  Plaintiff also alleges that as a result of Freeze-Out Merger, plaintiff was "squeezed out" out of SSM at an unfair price.[82]

        Additionally, the Freeze-Out Merger Materials contained untrue statements pertaining to the valuation of SSM stock. Specifically, the valuation did not account for the inflated salaries of the individual defendants and did not account for the likelihood of SSM recovering damages from plaintiff's forthcoming lawsuit, which plaintiff planned to bring derivatively on behalf of SSM against the individual defendants.

        However, plaintiff does not allege that the Freeze-Out Merger Materials were sent in furtherance of a fraudulent scheme. Indeed, plaintiff admits that the Freeze-Out Merger Materials were sent <u>after</u> the effective date of the Freeze-Out Merger, which occurred on October 24, 2008 and that the individual

---

[80]    Complaint ¶ 311.

[81]    Complaint ¶¶ 442 and 452.

[82]    Complaint ¶ 453.

defendants did not inform plaintiff or other shareholders about the Freeze-Out Merger until its effective date.

Therefore, the materials sent to plaintiff through United States mail could not have served to further any fraudulent scheme by defendants because any such scheme to squeeze-out plaintiff out as a shareholder of SSM had already been executed.  See Bardsley v. Powell, Trachtman, Logan, Carrle & Bowman, P.C., 916 F.Supp. 458, 464 (E.D.Pa. 1996) (Joyner, J.) which holds that a fraudulent scheme to divest plaintiff of control of the company was complete for purposes of analyzing predicate acts under RICO once the defendants seized control of the company.

Plaintiff does allege that the Freeze-Out Merger Materials contained false statements about the value of SSM stock.  However, plaintiff fails to allege the purpose of such false statements.  Moreover, even construing the Freeze-Out Merger Materials to be part of a fraudulent scheme to discourage shareholders from exercising their right to dissent to the valuation of SSM stock as calculated by SSM, plaintiff does not allege that she suffered an injury to her business and property because of those misrepresentations.

Rather, it is apparent that plaintiff was not detrimentally influenced by the Freeze-Out Merger Materials because she exercised her dissenters' rights on December 1, 2008, in accordance with the procedures set forth in the Freeze-Out

Merger Materials.[83]   Therefore, even if plaintiff alleged with
particularity a fraudulent scheme, plaintiff could not show a
resulting injury to her person or property, discussed <u>infra</u>.
"Reliance is a necessary component of proximate causation for a
civil RICO action predicated on fraud." <u>Walter v. Palisades
Collection LLC.</u>, 480 F.Supp.2d 797, 809 (E.D.Pa. 2007)
(Robreno, J.).

     B.   <u>Bank Fraud</u>

     Bank fraud requires three elements: (1) a scheme to
defraud a federally insured financial institution, (2) the
defendant participated in the scheme by means of false pretenses,
representations, or promises which were material, and (3) the
defendant acted knowingly. <u>Regent National Bank v. K-C Insurance
Premium Finance Co.</u>, 1997 U.S.Dist. LEXIS 20042 at *7 (E.D.Pa.
Dec. 17, 1997) (R. Kelly, J.).

     Plaintiff alleges that the individual defendants
unlawfully caused SSM to guarantee the $2.5 million debt,
sustained by Uniquad, to purchase the North Park Road Property.
Plaintiff further alleges that the individual defendants thereby
were able to obtain funds under the custody or control of a
financial institution by means of false and/or fraudulent
pretenses.

     Although plaintiff alleges that the individual
defendants, by creating Uniquad to purchase the North Park Road

---

    [83]   Plaintiff's Opposition to Defendants' Motion to Dismiss Complaint
Pursuant to F.R.C.P. 12(b)(6) and Memorandum of Law in Support Thereof, page
17.

Property, acted in furtherance of a scheme to defraud SSM and misappropriate a corporate opportunity, plaintiff does not allege that this scheme was directed at a federally insured financial institution.  Nor does plaintiff allege that the individual defendants made representations, or promises to a financial institution which were material in obtaining the loan on behalf of Uniquad or causing SSM to guarantee the loan.

Plaintiff does not even allege the name of the bank that provided the loan to Uniquad.  Accordingly, plaintiff's allegations are insufficient to establish a predicate act under RICO for bank fraud.

Even if plaintiff had established a predicate act for bank fraud, plaintiff would fail to establish liability under RICO because, as discussed in greater detail below, plaintiff would not be able to show a resulting injury to her business or property.  Presumably, the financial institution would be the entity harmed by the individual defendants committing bank fraud.

C.   Bankruptcy Fraud

Title 18 of United States Code Section 157 prohibits fraudulent representation, or filings during or before Chapter 11 bankruptcy proceedings.  Plaintiff's Complaint does not reference any Chapter 11 proceedings connected to SSM, the individual defendants, or any other person or entity.  Moreover, neither plaintiff, nor defendant address bankruptcy fraud in their briefs submitted in support of or opposition to defendants' motion to dismiss.  Accordingly, plaintiff has failed to establish

bankruptcy fraud as a predicate act under RICO.

<u>Pattern</u>

Establishing a pattern of racketeering activity "requires at least two acts of racketeering activity" within a span of ten years. 18 U.S.C. § 1961(5).  Although two predicate acts are necessary to form a RICO pattern of racketeering activity, they may not be sufficient.  <u>Westlake Plastic Company</u> <u>v. O'Donnell</u>, 1998 U.S.Dist. LEXIS 14664 at *169 (E.D.Pa. Sep. 17, 1998) (Reed, J.) (<u>citing</u> <u>H.J. Inc. v Northwestern Bell</u> <u>Telephone Co.</u>, 492 U.S. 229, 237-38, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195, 207 (1989)).

A plaintiff must also show that the racketeering acts are related and pose a threat of continued activity.  <u>Id.</u> Predicate acts are related if they have the "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." <u>Bonavitacola</u> <u>Electric Contractor, Inc.</u>, 87 Fed.Appx. at 232 (<u>quoting</u> <u>H.J. Inc.</u>, 492 U.S. at 239, 109 S.Ct. At 2900, 106 L.Ed.2d at 208 (1989)).  Relatedness will nearly always be satisfied if two predicate acts arise from the same transaction.  <u>Id.</u>

As discussed above, plaintiff sufficiently pled predicate acts of mail and wire fraud.  Both the mailing of the Buyback Letter and the publishing of the Press Release are pled with sufficient particularity to establish predicate acts under RICO.

However, plaintiff has not established that the two predicate acts establish a pattern of racketeering activity. Plaintiff has not alleged that the Buyback Letter and the Press Release were part of the same fraudulent scheme.  Indeed, the Buyback Letter was allegedly part of a scheme to induce SSM shareholders to tender their stock at an undervalued offer price. Hence, the shareholders who sold their stock were the victims of the individual defendants' scheme.

The Press Release, in contrast, was published as part of a scheme to enrich the individual defendants through Uniquad at the expense of SSM.  Therefore, SSM itself, was the victim of the individual defendants' scheme.  As a result, although the individual defendants were participants in both schemes, the purpose of each scheme and the victims of each scheme were different.

Because I conclude that plaintiff has failed to establish a pattern of racketeering activity, I grant defendants' motion to dismiss with respect to plaintiff's RICO claim. However, in the event this decision is reviewed upon appeal and sufficient allegations of a pattern of racketeering activity are found to be present within plaintiff's Complaint, I will analyze whether plaintiff's allegations are sufficient to show injury to plaintiff's business or property as required by RICO.

<u>Nexus to Defendants and Injury to Business or Property</u>

The United States Supreme Court has indicated that the "by reason of" language of the statute requires a RICO plaintiff

to establish that the defendants' violation is the proximate
cause of any injury.  Holmes v. Securities Investor Protection
Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 1319, 117 L.Ed.2d 532,
544 (1992).  Therefore, "in order for a plaintiff to have
standing under § 1964(c), there must be 'some direct relation
between the injury asserted and the injurious conduct alleged.'"
Federal Signal Corp. v. Wright, 1998 U.S.Dist. LEXIS 18811 at *6
(E.D.Pa. Nov. 25, 1998) (Bartle, J.) (quoting Holmes,
503 U.S. at 268, 112 S.Ct. at 1319, 117 L.Ed.2d at 544).

     When the victim of a RICO violation is a corporation
and the shareholder indirectly suffers harm from the corporate
injury, proximate cause is not met.  See Penn Mont Securities v.
Frucher, 502 F.Supp.2d 443, 466 (E.D.Pa. 2007) (Brody, J.).
Simply put, "[i]ndirect or derivative harms to a shareholder
plaintiff do not confer RICO standing."  Id.

     In determining whether an alleged injury is direct or
derivative for purposes of RICO, a court must make an independent
determination as to whether a plaintiff's claim asserts a direct
or derivative harm.  Penn Mont Securities, 502 F.Supp.2d at 458.
Accordingly, the parties' characterization of the claims is not
dispositive.  Id. at 459.

     Whether a claim is direct or derivative depends on
"(1) who suffered the alleged harm (the corporation or the suing
stockholders, individually); and (2) who would receive the
benefit of any recovery or any other remedy (the corporation or
the stockholders, individually)"  Penn Mont Securities,

-35-

502 F.Supp.2d at 458 (quoting Tooley v. Donaldson, Lufkin & Jenrette, 845 A.2d 1031, 1033 (Del. 2004)).

If the corporation suffers the alleged harm and would receive the benefit of the recovery, the claim is derivative. See Penn Mont Securities, 502 F.Supp.2d at 458.  In contrast, if the shareholder suffers the injury and would stand to directly benefit from a successful claim, the claim is direct and confers RICO standing on the plaintiff shareholder. See Id.

"Corporate waste is a 'classic' derivative harm" because "it diminishes the value of the corporation as a whole and entitles the corporation to recover damages." Penn Mont Securities, 502 F.Supp.2d at 465 (citing Winston v. Mandor, 710 A.2d 835, 845 (Del.Ch. 1997)).  Corporate waste encompasses excessive compensation and misappropriation of corporate opportunity.  Penn Mont Securities, 502 F.Supp.2d at 465.

As discussed above, plaintiff has sufficiently alleged two predicate acts of racketeering activity.  Specifically, plaintiff has alleged the individual defendants committed mail fraud in connection with their scheme to defraud shareholders when they tendered the stock repurchase offer communicated through the Buyback Letter.  Additionally, plaintiff alleges that defendants committed wire fraud through the publication of the Press Release in connection with the individual defendants' misappropriation scheme, in which the individual defendants diverted profits and rents from the North Park Road Property to Uniquad at the expense of SSM.

-36-

Neither scheme resulted in an injury to plaintiff's business or property.  Regarding the stock repurchase offer, plaintiff does not allege that she sold her stock pursuant to the terms of the Buyback Letter.  Rather, plaintiff avers that she owned SSM stock until she was "squeezed out" by the Freeze-Out Merger, effective on October 24, 2008.

Therefore, to the extent the individual defendants' scheme caused any injury, it was towards the 24 shareholders who sold their shares and not to plaintiff.

Moreover, when plaintiff was "squeezed out" because of the Freeze-Out Merger in 2008, the purported valuation of SSM stock was $11.03 per share.  Whether the $11.03 valuation was fair or not, plaintiff has not alleged that the individual defendants' representations in the Buyback Letter or otherwise induced her to keep her SSM stock to her financial detriment. See Walter, 480 F.Supp. 2d at 809.

Nor did the individual defendants' misappropriation of corporate opportunity directly harm plaintiff.  By diverting rents and profits from the North Park Road Property to Uniquad, the individual defendants harmed SSM.

Similarly, by causing SSM to guarantee the $2.5 million in debt sustained by Uniquad without consideration or collateral, SSM was harmed.  The injury was common to the corporation as a whole and was not suffered directly by plaintiff.  Of course, the financial well-being of SSM is tied to the value of plaintiff's stock and plaintiff's stock may have been worth more if the

individual defendants had not usurped corporate opportunities or engaged in other self-interested transactions.

However, "[i]ndirect or derivative harms to a shareholder plaintiff do not confer RICO standing." See Penn Mont Securities., 502 F.Supp.2d at 466.  Any injury plaintiff suffered caused by a diminished stock value was an indirect result of an injury inflicted upon SSM.

Plaintiff contends that her termination as a shareholder of SSM constitutes a direct injury sufficient to establish a RICO claim.[84]  Plaintiff's position with respect to suffering a direct injury may have merit.  Under Delaware law, minority shareholders suffer a direct injury when a controlling shareholder increases his ownership while diluting the ownership of the minority shareholders.  See Penn Mont Securities, 502 F.Supp.2d at 465 (citing Gentile v. Rossette, 906 A.2d 91, 100 (Del. 2006)).  Here, plaintiff has alleged that the individual defendants were controlling shareholders and that plaintiff was squeezed out of SSM because of the Freeze-Out Merger.

However, plaintiff does not allege that individual defendants engaged in racketeering activities in furtherance of the Freeze-Out Merger.  As analyzed, supra, plaintiff does not allege that the Freeze-Out Merger itself was a fraudulent scheme.

---

[84]   Plaintiff's Opposition to Defendants' Motion to Dismiss Complaint Pursuant to F.R.Civ.P. 12(b)(6) and Memorandum of Law in Support Thereof, page 36.

Nor did plaintiff rely on any misrepresentations in the Freeze-Out Merger Materials.

As alleged, the individual defendants may have breached their fiduciary duty in organizing and causing the Freeze-Out Merger.  However, any breach of duty did not involve deception or fraud.  Accordingly, the individual defendants did not perpetrate any of the predicate acts alleged by plaintiff necessary to establish a RICO claim pertaining to the Freeze Out Merger.

Because plaintiff has not alleged racketeering conduct resulting in a direct injury to plaintiff's business or property, plaintiff has failed to state a cause of action under RICO. Therefore, I grant defendants' motion to dismiss with respect to plaintiff's RICO claims.

<u>Amendment</u>

Plaintiff requests leave to amend her Complaint in order to allege a direct injury.  Plaintiff's Opposition to Defendants' Motion to Dismiss Complaint Pursuant to F.R.Civ.P. 12(b)(6) and Memorandum of Law in Support Thereof asserts that if given the opportunity to amend the Complaint, plaintiff would allege that she incurred substantial legal fees and expenses caused by the individual defendants racketeering activities.[85] Specifically, plaintiff would allege that defendants used mail and interstate telecommunication services as part of a fraudulent

---

[85]     Plaintiff's Opposition to Defendants' Motion to Dismiss Complaint Pursuant to F.R.Civ.P. 12(b)(6) and Memorandum of Law in Support Thereof, page 36.

scheme to stonewall plaintiff's attempts to inspect corporate records.

Plaintiff relies on <u>Lexington Insurance Co. v. Forrest</u> for the proposition that legal fees constitute an injury-in-fact sufficient to establish standing under RICO.  263 F.Supp.2d 986, 997 (E.D.Pa. 2003) (Brody, J.).

In <u>Lexington</u>, defendants secured financing for motion pictures by entering into an agreement in which plaintiff insured defendants' loans by agreeing to pay disparity between the film's revenue stream and the face of the loan amount.  263 F.Supp.2d at 990.  However, defendants fraudulently inflated their estimated sales receipts of the films and used funds from later projects to pay off debts incurred in earlier ones.  <u>Id.</u>  After defendants' scheme collapsed, defendants' creditors sued the plaintiff for the debt the plaintiff insured. 263 F.Supp.2d at 991.  Plaintiff sued defendant under RICO.  <u>Id.</u> at 990.

In evaluating defendants' 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, my colleague, then United States District Judge, now Senior District Judge, Anita Brody held that plaintiff's legal fees constituted an injury-in-fact that was fairly traceable to the challenged action of defendants.  <u>Id.</u> at 998.

However, in <u>Lexington</u>, Judge Brody was analyzing a 12(b)(1) motion in order to determine whether the plaintiff had constitutional standing to bring the action.  <u>Id.</u> at 996. Therefore, the analysis of constitutional standing is of little

-40-

import to the present act.  Analysis of a motion to dismiss under
Rule 12(b)(6) for lack of RICO standing is distinct from a motion
to dismiss under Rule 12(b)(1) for lack of constitutional
standing.  Walter, 480 F.Supp.2d 797, 804 n.10 (E.D.Pa. 2007)
(Robreno, J.).

However, plaintiff may be correct that legal fees can
confer standing under RICO.  In Walter, my colleague United
States District Judge Eduardo C. Robreno indicated that "[w]hile
there is some debate about whether legal fees can ever suffice as
'injuries' under RICO, the Third Circuit's focus on out-of-pocket
expenses leads to the conclusion that the payment of legal fees
can be actionable injuries under RICO." 480 F.Supp.2d at 804
(citing Maio v. Aetna, 221 F.3d 472, 483 (3d Cir. 2000)).

Even if legal fees constitute an actionable injury
under RICO, the legal fees still must be the proximate cause of a
defendant's racketeering activity.  480 F.Supp.2d at 809.
Plaintiff's proposed amendments to her Complaint regarding the
incurring of legal fees are not sufficient to demonstrate an
injury to plaintiff's business or property because such legal
fees would not be proximately caused by defendants' alleged
racketeering activities.

Even if plaintiff pled with particularity that the
defendants used racketeering activities (i.e. mail or wire fraud)
to stonewall plaintiff's requests for corporate records,
defendants would not be the proximate cause of plaintiff
incurring legal fees.

Unlike Lexington, in which the defendants' racketeering activities caused the defendants' creditors to sue the plaintiff, thereby directly causing the plaintiff to incur substantial legal fees, here, plaintiff was not hauled into court but rather incurred legal expenses at her own initiation in response to the individual defendants alleged racketeering activities.  Hence, plaintiff's legal expenses are not proximately caused by the defendants' conduct.  See Walter, 480 F.Supp. 2d at 805.

In Walter, the court stated, "[c]learly, any actions taken...to initiate or litigate the case sub judice cannot form the basis of RICO liability...RICO's injury requirement would be a nullity if paying an attorney to initiate the RICO action itself sufficed as damage." Id.

Plaintiff's legal expenses sustained in the struggle to obtain information about SSM's corporate finances were likely costly.  However, the legal expenses were not proximately caused by the individual defendants for purposes of RICO.

Plaintiff also requests leave to amend in order to plead that "the Freeze-Out Merger was spurred by the fraudulent conduct of the individual defendants, [and] was itself fraudulent and contemplated to cause the end of this action[.]"[86]  However, conclusory allegations that the Freeze Out Merger was fraudulent do not meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

---

[86]    Plaintiff's Opposition to Defendants' Motion to Dismiss Complaint Pursuant to F.R.Civ.P. 12(b)(6) and Memorandum of Law in Support Thereof, page 31.

Aside from the Freeze-Out Merger Materials, which were mailed to plaintiff after the completion of the merger, plaintiff has not alleged that the individual defendants sent any other mailings or utilized any wire communications respecting the Freeze Out Merger.  In fact, plaintiff avers that the individual defendants did not inform her or other shareholders about the Freeze-Out Merger prior to its effective date.[87]  Therefore, by plaintiff's own admission, mail and wire communications that possibly could have caused injury to plaintiff's business or property were not utilized in connection to the Freeze-Out Merger.

Because I conclude that plaintiff has failed to state a claim under RICO by failing to allege a pattern of racketeering activity and an injury to plaintiff's business of property, and because I conclude that amendments to the Complaint will be futile, I grant defendants' motion to dismiss with respect to plaintiff's RICO claim.

### Pendant State Law Claims

Defendants urge the court to exercise supplemental jurisdiction over plaintiff's thirteen state law claims and dismiss plaintiff's Complaint in entirety.  I decline to do so.

"Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if: "(1) the state law claims raise novel or complex issues, (2) the state law claims substantially predominate over the federal claim, (3) it

---

[87]     Complaint, ¶ 313.

-43-

has dismissed all of the federal claims, or (4) if there are other compelling reasons for declining jurisdiction." Smith v. Jones, Gregg, Creehan & Gerace, LLP., 2008 U.S.Dist. LEXIS 98530 at *26 (W.D.Pa. Dec. 5, 2008).

Here, the state law claims substantially predominate over the federal claim, which has been dismissed.  I conclude exercising supplemental jurisdiction over the state law claims is not warranted.  Accordingly, I remand this matter back to the Court of Common Pleas of Berks County, Pennsylvania.

<u>CONCLUSION</u>

For the foregoing reasons, I grant defendants' motion to dismiss plaintiff's RICO claim, with prejudice, and dismiss the remainder of plaintiff's Complaint for lack of subject matter jurisdiction, without prejudice to raise the issues contained in the within motion to dismiss regarding plaintiff's remaining state law claims as preliminary objections in state court.